## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KYLE TURRI,

       *Plaintiff,*

v.

MCLAREN HEALTH CARE
CORPORATION,

       *Defendant.*

CASE NO.: 2:23-cv-13119

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiff Kyle Turri ("Plaintiff"), on behalf of himself and all others similarly situated alleges the following complaint against Defendant McLaren Health Care Corporation ("McLaren" or "Defendant") upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1.     Defendant has an extensive medical network across Michigan including 14 hospitals with a total bed capacity of 2,624 and a support team of hundreds of physicians. Defendant is a fully integrated health care delivery system with an annual revenue of $6.6 billion and employs approximately 28,000 full-time staff.

2.     Defendant McLaren became aware that there was significant suspicious

activity occurring on its computer systems at least as early as August 22, 2023.

3.     Defendant investigated and as early as August 31, 2023 became aware that unauthorized parties had hacked its systems and accessed the McLaren computer network between at least the dates of July 28, 2023 and August 23, 2023.

4.     On October 10, 2023, McLaren finally announced that it had experienced a major data breach and that this resulted in the disclosure and theft of approximately 2.2 million individuals' extremely sensitive personal identifying information (PII) and protected health information (PHI).

5.     Despite McLaren's public statement on their website that letters would be going out to impacted individuals on October 10, and their statement that the investigation had concluded on October 10, 2023, it took McLaren nearly a month to actually send out notices to many or even most impacted parties, including Plaintiff Turri. On information and belief, actual written notices were not mailed to most impacted parties until at least November 9, 2023.[1][2] Additionally, these messages were sent by standard US mail and often were not received for more than a week after purported dispatch.

6.     The disclosed PII and PHI encompassed an extraordinarily broad

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/40c59f93-d7fd-4133-8148-a05a244b96b7.shtml

[2] https://oag.ca.gov/system/files/McLaren%20-%20Notice%20of%20Data%20Breach%20-%20CA_0.pdf

degree of highly sensitive information. In a notice on its website, McLaren has already confirmed that the extremely sensitive information about patients which has been compromised includes: "Social Security number, health insurance information, date of birth, and medical information including billing or claims information, diagnosis, physician information, medical record number, Medicare/Medicaid information, prescription/medication information, diagnostic results, and treatment information."[3]

7.     McLaren understands the high value of this information, including medical information, to outside parties including criminal organizations. Indeed, McLaren either knew or should have known that hackers would likely attempt to target McLaren. In May 2021, McLaren received notice of a security incident involving network services of one of its vendors, Elekta AB.[4] In that incident, McLaren reported that the following information may have been breached: "Full Name, Social Security number, address, date of birth, height, weight, medical diagnosis, medical treatment details, appointment confirmations, and other information that McLaren Health Care Corporation may collect as part of providing health care services."[5] The 2021 incident targeting organizations associated with

---

[3] https://www.mclaren.org/main/notification (last accessed 12/4/23)
[4] https://www.mclaren.org/Uploads/Public/Documents/corporate/Elekta-Substitute-Notice.pdf (last accessed 12/4/2023)
[5] *Id.*

McLaren should have, at minimum, put them on notice that they could be at risk for a similar breach and were probable targets for hackers. Indeed, the 2021 incident was a less severe disclosure than the 2023 data breach as the 2023 data breach included, among other things, billing information.

8.    In the wake of the 2021 incident McLaren reiterated their commitment to "protecting the security and privacy of patient information."[6]  McLaren also advised patients that they were implementing "Enhancements, including rigorous data security procedures … to protect patient information and defend against the threat of cyber threats."[7] These statements, among others, would tend to persuade patients that McLaren was taking appropriate security measures to protect patient data in the face of a rising threat profile.

9.    Despite the wealth of warnings McLaren received about the risk to the data they stored, including PII and PHI, McLaren did not implement adequate security measures.

10.    The failure to implement adequate data security measures in the face of the obvious threat profile made a data breach entirely foreseeable, and indeed probable. Moreover, the length with which this breach went undetected purportedly between July 28, 2023 and August 23, 2023 is significant. Unauthorized criminal

---

[6] *Id.*

[7] *Id.*

parties had access to extremely sensitive PII and PHI for nearly one month before it was detected. Had McLaren implemented more stringent data monitoring practices they could have identified the suspicious activity sooner and mitigated harm to the plaintiff class.

11.     Moreover, once McLaren became aware of the breach, its unreasonable delay in notifying patients of the breach harmed patients and their ability to take timely corrective action.

12.     This delay in notification to victims of the breach is unacceptable and directly harms victims of the breach, including Plaintiff, by creating uncertainty about whether they have actually been harmed and the need to engage in various services and efforts in the wake of the data breach including but not limited to examining whether PII or PHI has been sold on the dark web, taking measures to protect against identity theft crimes, expenses, and/or time spent on credit monitoring and identity theft insurance, time spent examining bank statements, time and effort spent initiating fraud alerts, and other consequential harm.

13.     Additionally, many individuals in similar circumstances, including Plaintiff, were directly harmed by the unreasonable delay in detection and reporting by McLaren. Plaintiff Turri was the victim of an identity theft crime on August 23, 2023 when a fraudulent bank account was opened in his name and was used to transfer approximately $8,900 from Mr. Turri's genuine account to the fraudulent

account. Although McLaren was aware of suspicious activity on August 22, 2023 before the identity theft occurred, Plaintiff Turri was unaware his data was at risk until he received written notice from Defendant on or about November 17, 2023. Defendant's offer of an identity protection service on November 17, 2023 was too little and too late.

14.    Had McLaren timely advised Plaintiff and class members of the breach to their account and systems, Plaintiff and class members could have taken timely measures to protect their identities and to mitigate the harm caused by the data breach. However, because of the extraordinary negligence in delaying announcing the data breach and in notifying those directly affected, McLaren directly harmed Plaintiff and like class members by creating uncertainty and allowing criminals to commit identity theft and fraud crimes against patients of McLaren who had not been informed of the breach. In addition to direct financial losses, Plaintiff and class members had to engage in an expensive and time-consuming process to properly protect their identity which caused significant stress, anxiety, and loss of valuable time.

15.    Plaintiff, individually and on behalf of all others similarly situated, alleges claims of Negligence, Breach of Implied Contract, Unjust Enrichment, and for a Michigan Subclass under Michigan's Nonprofit Health Care Corporation Reform Act (Mich. Comp. Laws. Ann. § 550.1406) and the Michigan Consumer

Protection Act (Mich. Comp. Laws § 445.903)(the "MCPA"). Plaintiff, individually and on behalf of all others similarly situated, asks the Court to compel Defendant to adopt reasonable information security practices to secure the sensitive medical and PII that Defendant collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

### *Plaintiff*

16.    Plaintiff Kyle Turri is a resident and citizen of Michigan who used McLaren's services. On information and belief, Plaintiff's compromised PII was used to commit an identity theft crime that cost Mr. Turri thousands of dollars on August 23, 2023. On November 17, 2023 Mr. Turri finally received notice from defendant that his PII may have been compromised by the breach.

### *Defendant*

17.    Defendant McLaren is a "is a $6.6 billion, fully integrated health care delivery system" that "includes 13 hospitals in Michigan, ambulatory surgery centers, imaging centers, a 490-member employed primary and specialty care physician network, commercial and Medicaid HMOs covering more than 732,838 lives in Michigan and Indiana[.]"[8] Its headquarters and principal pace of business is in Grand Blanc, Michigan.

---

[8] https://www.mclaren.org/main/about-mclaren-health-care last accessed 12/1/2023

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction and diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The class contains more than 100 members, and many of these members have citizenship diverse from McLaren. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the case in controversy.

19.    The exercise of personal jurisdiction over McLaren is appropriate as its headquarters and principal place of business is in Grand Blanc, Michigan.

20.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events giving rise to the claims emanated from activities within this District, and McLaren conducts substantial business in this District.

## FACTUAL ALLEGATIONS

### I.    Background

21.    Defendant McLaren is a "is a $6.6 billion, fully integrated health care delivery system" that "includes 13 hospitals in Michigan, ambulatory surgery centers, imaging centers, a 490-member employed primary and specialty care physician network, commercial and Medicaid HMOs covering more than 732,838

lives in Michigan and Indiana[.]"[9]

22.    Plaintiff and members of the Plaintiff Class are former or current patients who used McLaren's services.

23.    In order to receive treatment, Plaintiff and members of the Plaintiff class were required to provide all or part of the following non-exclusive list of sensitive PHI and PII during the regular course of business:

- Full name and mailing or personal address.

- State and/or Federal Identification.

- Social Security Number.

- Health insurance information including but not limited to carrier, policy number, and healthcare card.

- Date of birth.

- Medical information including but not limited to information about diagnosis and treatment, personal medical history, family medical history, mental health information, information related to STDs and treatment, medication information, and medical record number.

- Information about physicians and related medical professionals who had been involved in previous or ongoing treatment of the patient.

---

[9] https://www.mclaren.org/main/about-mclaren-health-care last accessed 12/1/2023

- Residence and travel history.

- Billing and claims information including but not limited to information related to credit and debit card numbers, bank account statements and account numbers, and insurance payment details.

- Medicare/Medicaid information.

- Information on prescriptions taken including history of taking certain prescriptions.

- Diagnostic results and treatment information.

- Information on family members including but not limited to emergency contact information and next of kin.

- Personal email addresses and phone numbers.

- Workers' comp or employment related information.

24.   The above information is extremely sensitive personal identifying information and personal health information (PII and PHI). This information is extremely valuable to criminals because it can be used to commit serious identity theft and medical identity theft crimes.

25.   As a condition of doing business and obtaining the services of McLaren, class members entrusted McLaren with this information with the explicit and implicit understanding that the information would be kept secure and that reasonable measures would be taken to maintain and ensure the security, including

notification in the event of a breach, commensurate with the value of data.

## II.    The Breach

26.    At least as early as August 22, 2023, McLaren became aware of suspicious activity in its computer systems.

27.    By August 31, 2023, McLaren had determined that their networks had been breached and information had been acquired by an unauthorized party between July 28, 2023, and August 23, 2023.

28.    McLaren did not notify patients a breach had occurred until it issued a public notice on October 10, 2023.

29.    Despite McLaren stating in its October 10, 2023 public notice that it would be mailing notice letters with more information to impacted individuals for whom they had a mailing address, many individuals, including Plaintiff, did not receive such a letter for more than a month.

30.    The delay between the August 22, 2023 detection of suspicious activity and the October 10, 2023 generalized notice of a breach was unreasonable and directly harmed patients including Plaintiff. Moreover, the additional unreasonable delay of more than one month between the generalized announcement on October 10 and the delivery of notice to individuals impacted by the breach directly harmed class members.

31.    McLaren knew or should have known Plaintiff Turri was a victim of

the data breach at least as early as October 10, 2023. In a letter dated November 9, 2023, and which was not received by Plaintiff until November 17, 2023, Defendant stated "we undertook a thorough review of the potentially impacted files to determine whether any sensitive information was present. It was through this process, **which concluded on October 10, 2023,** that we determined that information pertaining to you may have been included in the potentially impacted files."[10] (emphasis added). By McLaren's own admission, they had determined that Plaintiff and class members had been victimized in a process which "concluded on October 10, 2023." The subsequent one-month delay in sending notifications to the impacted parties and class members directly harmed them.

32.    Additionally, McLaren made public statements about how rapidly they would advise patients who had been victims of the data breach. Specifically, the Michigan Attorney General's office reported that McLaren had stated it was "investigating reports that some of [its] data may be available on the dark web and **will notify individuals whose information was impacted, if any, as soon as possible."[11]** (emphasis added). Notably, the Michigan AG's office released this information on October 6th, prior to McLaren's October 10th breach notification.

---

[10] See Exhibit A

[11] https://www.michigan.gov/ag/news/press-releases/2023/10/06/ag-nessel-notifies-michigan-residents-of-mclaren-ransomware-attack Last accessed 12/6/2023

33.   The Attorney General's office also issued a statement in that same release that "time is of the essence when a breach occurs to ensure affected individuals can take the necessary steps to protect their identities."[12]

34.   McLaren's October 6 public statement that it would "notify individuals whose information was impacted … as soon as possible" is misleading. Although McLaren claims their investigation, "which concluded on October 10, 2023" determined the individuals who were impacted, McLaren did not send out notifications to individuals whose information was impacted until November 9, 2023, and even then used slow mail for the notification deliveries. A minimum one-month delay between identification of impacted individuals and sending notices to impacted individuals cannot possibly be considered a notification sent "as soon as possible."

35.   The statement that notifications would be sent as soon as possible is deceptive and misleading.

36.   As of the time of filing (December 8, 2023), it is still unclear precisely how the breach occurred and exactly what measures McLaren is taking to ensure the security of customer data and to protect against any additional incidents.

37.   Although McLaren has offered some customers identity theft monitoring access, it offered the service far too late for many individuals including

---

[12] *Id.*

Plaintiff Turri, and the limited monitoring time period is entirely insufficient for the lingering identity theft threats that may persist as the result of such a substantial breach.

38.    The scope of the Data Breach is likely massive. Widespread Public reporting states the information on at least 2.2 million patients of McLaren was breached.[13][14]

### III.    McLaren's Privacy Representations

39.    McLaren acknowledges its legal and contractual obligations to protect its clients' sensitive PII. According to the Defendant's required "Notice of Privacy Practices."   McLaren stated: "We care about your privacy. The PHI we use or disclose is private … Only people who have both the need and the legal right may see your PHI."[15] Inherent to this promise about limiting the disclosure of information and the sensitive nature of the PHI and PII, is the notion that McLaren will use reasonable measures to secure this extremely sensitive data. McLaren reiterated these representations in its online policy where it states that "we seek to use

---

[13] https://www.michigan.gov/ag/news/press-releases/2023/10/06/ag-nessel-notifies-michigan-residents-of-mclaren-ransomware-attack
[14] https://techcrunch.com/2023/11/13/mclaren-cyberattack-millions-patients-ransomware/
[15] https://www.mclarenhealthplan.org/uploads/public/documents/healthplan/documents/MHP%20Documents/NoticeofPrivacyPracticeMHP.pdf (Last accessed 12/5/2023)

reasonable measures to protect Personally Identifiable Information"[16] [sic].

40.     McLaren also provided a list of patient rights to patients in the required notice of privacy practices. Among other rights McClaren promised patients as follows: "**Your Right to Receive Notification of a Breach.** If our actions result in a breach of your unsecured PHI we will notify you of that breach."[17]

41.     Additionally, as early as October 6, 2023, as discussed above, McLaren told potential victims that they would be advised "as soon as possible."[18] The only reasonable interpretation of McLaren's statements is that patients and victims would, in fact, be advised "as soon as possible" in the event of a data breach as soon as McLaren was made aware of the potential threat. Given the extremely sensitive nature of the PII and the PHI McLaren was regularly entrusted with, it is reasonable to expect that McLaren would attempt to immediately notify patients of any breach of this highly sensitive data. Delaying notifying patients of a breach for nearly three months cannot be a reasonably timely notification of a breach.

42.     McLaren unreasonably delayed in sending out breach notifications, and this unreasonable delay directly harmed Plaintiff and class members.

---

[16] https://www.mclaren.org/main/web-privacy-policy (last accessed 12/5/2023
[17] *Id.*
[18] https://www.michigan.gov/ag/news/press-releases/2023/10/06/ag-nessel-notifies-michigan-residents-of-mclaren-ransomware-attack Last accessed 12/6/2023

## IV.    McLaren Failed to Comply with Reasonable Cybersecurity Standards

43.    At all times relevant to this Complaint, McLaren knew or should have known the significance and necessity of safeguarding its customers' PII and PHI, and the foreseeable consequences of a data breach. McLaren knew or should have known that because it collected and maintained the PII and PHI for a significant number of customers, a significant number of customers would be harmed by a breach of its systems. McLaren further knew due to the nature of its business practices as a fully integrated health care delivery systems with dozens of hospitals, hundreds of doctors, and millions of patients, that a data breach could potentially result in the release of deeply personal, sensitive, and costly information about its patients.

44.    Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

45.    An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices

that businesses should implement to protect PII.[19] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

46.    The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

47.    The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures—a step that would have been particularly prudent in light of the methods used by the perpetrators in this case.

48.    Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential

---

[19] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last accessed 12/06/2023)

consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

49.     Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

50.     McLaren knew or should have known of its obligation to implement appropriate measures to protect its customers' PII but failed to comply with the FTC's basic guidelines and other industry best practices, including the minimum standards set by the National Institute of Standards and Technology Cybersecurity Framework Version 1.1.[20]

51.     Defendant's failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

52.     McLaren failed to use reasonable care in maintaining the privacy and security of Plaintiff' and Class Members' PII and PHI. If McLaren had implemented adequate security measures, cybercriminals could never have accessed the PII of Plaintiff and Class Members, and the Data Breach would have either been prevented

---

[20] https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf. (last accessed 11/27/2023)

in its entirety or have been much smaller in scope. For example, if McLaren had implemented adequate monitoring systems, they could have detected the suspicious activity patterns back in July 2023 and notified patients, including Plaintiff, of the risk much sooner. Additionally, while we do not yet know the precise reasons for the breach, poor data security practices and lack of compartmentalization are common patterns in data breaches of this magnitude and sensitivity. Finally, once McLaren became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including sending notifications to those impacted.

53.     Personally Identifiable Information is of high value to criminals. Sensitive information can often be sold on the dark web, with personal information being sold at a price ranging from $40 to $200 and bank details with a price from $50 to $200.[21] The Data Breach exposed PII that is both valuable and highly coveted on underground markets because it can be used to commit identity theft and financial fraud. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards.  Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical

---

[21] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, available at:
https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/  (last accessed November 22, 2023).

treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. The one year of identity protection services offered to victims is too little and too late given the extraordinary scale of the breach and the potential for consequences lingering for years. These identity thieves will also re-use stolen PII, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII.

54.     Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[22] Both Plaintiff Turri and members of the member class generally have spent hours on end and considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing

---

[22]https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identityt heft.pdf. (last accessed 12/06/2023)

up the issues."[23]

55.     The information compromised in the Data Breach—including detailed medical information is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts McLaren customers and patients at additional risk for potential medical fraud and medical identity theft.

56.     Data breaches involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[24] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[25] and that this may have far reaching consequences for a victim's ability to access medical care

---

[23] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last accessed 12/06/2023)
[24] *See What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).
[25] *Id*

and use insurance benefits.

57.     Security standards for businesses storing PII and PHI commonly include, but are not limited to:

      a.  Maintaining a secure firewall.

      b.  Monitoring for suspicious or unusual traffic on the website.

      c.  Looking for trends in user activity including for unknown or suspicious users.

      d.  Looking at server requests for PII.

      e.  Looking for server requests from VPNs and Tor exit notes.

      f.  Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII.

      g.  Structuring a system including design and control to limit user access as necessary including a users access to the account data and PII of other users.

58.     Additionally, on its website privacy policy, McLaren claims that it uses "software programs to monitor traffic to identify unauthorized attempts to upload or change information or otherwise cause damage."[26]

59.     However, by defendant's own admission on October 10, unauthorized agents had access to internal information and systems for nearly a month in July and

---

[26] https://www.mclaren.org/main/web-privacy-policy (last accessed 12/5/2023)

August of 2023.

### V.    Plaintiff's and Class Experiences

60.    To use Defendant's Service, Plaintiff provided sensitive PII and PHI including his full name, address, date of birth, and social security number. Released data on class members includes, but is not limited to: patient name and contact information including mail address, email address, and phone number, state and/or federal identification, social security number, health insurance information including healthcare cards, date of birth, medical information including information related to medical history, diagnosis, and treatment, information about treating physicians and medical professionals, billing and claims information including payment details, medication and prescription history, mental health information, contact information for family members including full names, personal relationship, and phone number, Medicare/Medicaid information, workers comp or employment related information.

61.    Plaintiff has taken reasonable steps to maintain the confidentiality of his PII. He relied upon McLaren's representations, experience, and sophistication to keep his information secure and confidential.

62.    As a result of the data breach, Plaintiff was forced to take measures to mitigate the harm, including spending time monitoring his credit and financial accounts, researching the Data Breach, and researching and taking steps to prevent

and mitigate the likelihood of identity theft.

63.     In addition, as a result of the data breach and while McLaren was aware of breach activity, but before McLaren had notified Plaintiff of the breach, criminal actors used the breach data to commit an identity theft crime against Plaintiff – namely using Plaintiff's PII to open a fraudulent account in Plaintiff's name and to then transfer money that legitimately belonged to Plaintiff into the fraudulent account.

64.     Plaintiff Turri lives in Michigan and has been a patient of McLaren. When he learned his identity had been stolen, Plaintiff Turri took steps to monitor and secure his identity, including contacting his bank and changing his bank and email passwords, contacting other financial services to increase security or lock accounts, filing a federal identity theft document and documentation, making multiple statements to police, and other major efforts to recover the lost assets and to protect his identity.

65.     As a result of the Data Breach, Plaintiff Turri suffered actual injuries including: (a) paying money to McLaren for services, which Plaintiff would not have done had McLaren disclosed that it lacked data security practices adequate to safeguard Plaintiff' PII and PHI from theft; (b) damages to and diminution in the value of Plaintiff's PII—property that Plaintiff entrusted to McLaren as a condition of receiving its services; (c) loss and invasion of Plaintiff' privacy; (d) injuries

arising from the increased risk of fraud and identity theft, including the cost of taking reasonable identity theft protection measures, which will continue for years, and (e) actual injury in fact of approximately $8,900 due to identity theft that required PII of the same type that was breached.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Nationwide Class and Michigan Subclass, defined as follows:

**All persons in the United States whose PII/PHI were compromised by the Data Breach announced by McLaren in 2023**

67.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a Michigan subclass (the "Michigan Subclass") for statutory claims pursuant Michigan Mich. Comp. Laws Ann. § 550.1406, and Mich. Comp. Laws § 445.903 (the MCPA) and defined as follows:

**All persons in Michigan whose PII/PHI were compromised by the Data Breach announced by McLaren in 2023**

68.    Excluded from the Nationwide Class and Michigan subclass are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class are any judges, justices, or judicial officers presiding

over this matter and the members of their immediate families and judicial staff.

69.     This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

70.     **Numerosity.** The Nationwide Class are so numerous that the individual joinder of all members is impracticable. While the Nationwide Class exact number are currently unknown and can only be ascertained through appropriate discovery, Plaintiff, on information and belief, allege that the Nationwide Class includes at least 2 million members based on representations by McLaren.

71.     **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Nationwide Class Members. These common questions, which do not vary among Nationwide Class Members and which may be determined without reference to any Nationwide Class Member's individual circumstances, include, but are not limited to:

    a.  Whether Defendant knew or should have known that its systems were vulnerable to unauthorized access;

    b.  Whether Defendant failed to take adequate and reasonable measures to ensure its data systems were protected;

    c.  Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term

breach;

d.  Whether Defendant unreasonably delayed in notifying patients once they discovered suspicious activity;

e.  Whether Defendant unreasonably delayed in notifying patients they had confirmed a breach of their data systems;

f.  Whether Defendant unreasonably delayed in notifying victims once Defendant had concluded its investigation;

g.  Whether Defendant owed a legal duty to Plaintiff and Class Members to protect their PII and PHI;

h.  Whether Defendant breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII and PHI;

i.  Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

72.  **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

73.  **Adequacy of Representation.** Plaintiff is an adequate Nationwide

Class and Subclass representative because he is a Nationwide Class Member and Michigan Subclass Member, and his interests do not conflict with the Nationwide Class or Subclass interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and their counsel intend to prosecute this action vigorously for the Nationwide Class' and Subclass' benefit and will fairly and adequately protect their interests.

74. **Predominance and Superiority.** The Nationwide Class and Subclass can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Nationwide Class and Subclass Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class and Subclass member's claim is impracticable. Even if each Nationwide Class and Subclass member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management

difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

75. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Nationwide Class

76. Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

77. Plaintiff was required to provide PII and PHI as a precondition for using the McLaren healthcare services.

78. Plaintiff and Class Members entrusted their PII and PHI to McLaren with the understanding that McLaren would safeguard their PII and PHI.

79. In its written privacy policies, McLaren committed to taking reasonable

steps to protecting patient PHI and PII. McLaren also acknowledged its obligation to abide by privacy regulations including HIPAA and committed to limit the degree to which this sensitive information was shared with other parties.

80.    However, it appears millions of users (including Plaintiff) had sensitive data "shared" with hackers without their knowledge or consent.

81.    McLaren did not take reasonable and appropriate safeguards to protect Plaintiff and Class Members' PII.

82.    McLaren had full knowledge of the sensitivity of the PII that it stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed.

83.    McLaren violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing McLaren's information security controls sufficiently rigorously to ensure that PII and PHI in its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify customers of the breach in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

84.   McLaren's duty of care arose from, among other things,

a.   McLaren's exclusive ability (and Class Members' inability) to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;

b.   Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;

c.   McLaren's common law duties to adopt reasonable data security measures to protect customer PII and to act as a reasonable and prudent person under the same or similar circumstances would act; and

d.   State statutes requiring reasonable data security measures, including the Michigan Nonprofit Health Care Corporation Reform Act (MCLS § 550.1406) which requires exercise of "reasonable care to secure these records from unauthorized access and to collect only personal data that are necessary for the proper review and payment of claims and for health care operations, treatment, research, payment, health oversight activities, or when required by law." And which requires that health care corporations implement policies that

"assure that no person shall have access to personal data except on the basis of a need to know."

85.     McLaren's violation of the FTC Act and state Nonprofit Health care Corporation Reform Act statutes constitutes negligence per se for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the types of harm that resulted from the Data Breach.

86.     McLaren is a full spectrum healthcare provider with billions of dollars in annual revenue. McLaren had the financial and personnel resources necessary to prevent the Data Breach. McLaren nevertheless failed to adopt reasonable data security measures, in breach of the duties it owed to Plaintiff and Class Members.

87.     Plaintiff and Class Members were the foreseeable victims of McLaren's inadequate data security. McLaren knew that a breach of its systems could and would cause harm to Plaintiff and Class Members.

88.     Indeed, McLaren knew that close affiliates to McLaren had suffered data breaches and as recently as 2021, McLaren was required to send out notices about a similar breach. McLaren was aware they were a likely target for attacks.

89.     McLaren's conduct created a foreseeable risk of harm to Plaintiff and Class Members. McLaren's conduct included its failure to adequately mitigate harm through negligently failing to inform patients and victims of the breach for nearly

three months after the purported first discovery of suspicious activity.

90.    McLaren knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI, the importance of providing adequate data security over that PII and PHI, and the frequent cyberattacks within the medical industry.

91.    McLaren through its actions and inactions, breached its duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in their possession and control. McLaren breached its duty by, among other things, its failure to adopt reasonable data security practices and its failure to adopt reasonable security and notification practices in the result in a breach including monitoring internal systems and sending notifications to affected victims. McLaren failed to notice suspicious activities during July 2023  and for most of August 2023 and failed to implement sufficiently stringent security measures.

92.    McLaren inadequately safeguarded consumers' PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

93.    But for McLaren's breach of its duty to adequately protect Class Members' PII and PHI, Class Members' PII and PHI would not have been stolen.

94.    There is a temporal and close causal connection between McLaren's

failure to implement adequate data security measures and notification practices, the Data Breach, and the harms suffered by Plaintiff and Class Members.

95.   As a result of McLaren's negligence, Plaintiff and Class Members suffered and will continue to suffer the damages alleged herein.

96.   Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

**Count 2**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Nationwide Class**

97.   Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them by reference as though set forth in full.

98.   Plaintiff and Class Members entered into an implied contract with McLaren when they entrusted Defendant with their PII and PHI.

99.   As part of these transactions, McLaren agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

100.   Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that McLaren's data security practices and policies were

reasonable and consistent with the legal requirements and industry standards. Plaintiff and Class Members believed that McLaren would use part of the monies paid to McLaren under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

101. Plaintiff and Class Members would not have provided and entrusted their PII and PHI to McLaren or would have paid less for McLaren's products or services in the absence of the implied contract or implied terms between them and McLaren. The safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

102. Plaintiff and Class members fully performed their obligations under the implied contracts with McLaren.

103. McLaren breached its implied contracts with Plaintiff and Class Members to protect their PII when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) disclosed that information to unauthorized third parties and; (3) failed to notify Plaintiff and Class Members in a reasonably timely manner.

104. As a direct and proximate result of McLaren's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following:

ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the McLaren Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

105. As a direct and proximate result of the breach, Plaintiff is entitled to relief as set forth herein.

### Count 3
### Unjust Enrichment
### On behalf of Plaintiff and the Nationwide Class

106. Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this by reference as though set

forth in full.

107.   Plaintiff and Class Members entered into an implied contract with McLaren when they obtained products or services from McLaren, joined a healthcare program, or otherwise provided PII or PHI to McLaren.

108.   As part of these transactions, McLaren agreed to safeguard and protect the PII and PHI of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised.

109.   Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that McLaren's data security practices and policies were reasonable and consistent with legal requirements and industry standards. Plaintiff and Class Members believed that McLaren would use part of the monies paid to McLaren under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

110.   Plaintiff and Class Members would not have provided and entrusted their PII and PHI to McLaren or would have paid less for McLaren products or services in the absence of the implied contract or implied terms between them and McLaren. The safeguarding of the PII and PHI of Plaintiff and Class Members was critical to realize the intent of the parties.

111.   Plaintiff and Class members fully performed their obligations under the

implied contracts with McLaren.

112.  McLaren breached its implied contracts with Plaintiff and Class Members to protect their PII and PHI when it (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) disclosed that information to unauthorized third parties and; (3) failed to notify Plaintiff and Class Members in a timely and reasonable fashion.

113.  As a direct and proximate result of McLaren's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary

as mitigation measures because of McLaren's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

**Count 4**
**Violation of the Michigan Consumer Protection Act (MCPA)**
**Mich. Comp. Laws § 445.903**
**On Behalf of Plaintiff and the Michigan Subclass**

114.   Plaintiff incorporates by references and reallege each and every allegation above as though fully set forth herein.

115.   12. The Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 445.901, *et seq.*, prohibits "unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).

116.   As described in this Complaint, McLaren has engaged in unfair, unconscionable, and deceptive trade practices that are unlawful under the MCPA.

117.   McLaren omitted and concealed the fact that it did not employ reasonable safeguards to protect consumers' PII. Indeed, after the 2021 Elekta data breach discussed above, McLaren advertised the fact that they were enhancing their commitment to the "security and privacy" of patient information including through "enhancements, including rigorous data security protocols … to protect patient

information and defend against the threat of cyber threats."[27]  McLaren could and should have made a proper disclosure during patient intake or by any other means reasonably calculated to inform consumers of the inadequate data security. McLaren knew or should have known that its data security practices were deficient. This is true because, among other things, McLaren was aware that the extremely sensitive nature of the information they held both financial and medical, would make them a likely target of sophisticated cyberattacks. McLaren knew or should have known that its data security was insufficient to guard against those attacks.

118.   Moreover, prior to the data breach McLaren both expressly and implicitly assured patients that in the event of a data breach the victims would be individually notified in a reasonable and prompt manner.

119.   Indeed, in the midst of the data breach, on or about October 6 2023, McLaren made a statement that they would inform affected individuals "as soon as possible."

120.   McLaren's decision to wait to send individual notifications until November 9, 2023, and its subsequent decision to send those notices by a slower mail service, were not "as soon as possible." Additionally, the message was not reasonable under the circumstances. Additionally, the message itself (Exhibit A) is

---

[27] https://www.mclaren.org/Uploads/Public/Documents/corporate/Elekta-Substitute-Notice.pdf (Last accessed 12/5/2023)

generic and does not specify any specific type of information breached beyond all types of information that may have possibly been breached in the data breach generally. There is no reasonable reason the notices could not have been sent more expeditiously.

121.   McLaren's representations that they would notify victims of the data breach as soon as possible or otherwise reasonably promptly were deceptive and had a tendency to mislead customers.

122.   Specifically, customers could have been misled to believing that their specific information had not been breached because they had not received a notice, and would have therefore failed to take identity theft protection measures during the critical time-sensitive window after discovery of the breach.

123.   Plaintiff and Class Members transacted with McLaren in Michigan by, among other things, contracting to enter into an agreement for health care services. Plaintiff and Class Members were deceived when they joined and used McLaren's Michigan-based services despite deficient data security practices.

124.   Defendant had a duty to disclose its insufficient security practices and breach notification practices and did not do so.

125.   As a direct and proximate result of Defendant's unfair, unlawful, and deceptive acts and practices, Plaintiff and Class Members were injured, lost money or property, and suffered the various types of damages alleged herein.

126. Due to their misrepresentations and unlawful trade practices, defendants violated the following provisions of the MCPA § 445.903.

> (c) "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.";

> (e) "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.";

> (s) "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."; and

> (cc) "Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."[28]

127. Plaintiff and Class Members are entitled to the injunctive relief requested herein to address McLaren's past and future acts of deceptive and unfair trade practices.

128. Plaintiff and Class Members are entitled to restitution of money and

---

[28] https://www.legislature.mi.gov/(S(oukmciemwwvgwroj2un4d3ov))/mileg.aspx?page=getObject&objectName=mcl-445-903 Last accessed 12/6/2023

property that was acquired by McLaren by means of its unfair competition and restitutionary disgorgement of all profits accruing to McLaren as a result of its unfair business practices.

129.   Plaintiff and Class Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, as well as long term incalculable risk associated with medical fraud and release of PII and PHI.

130.   Damages include but are not limited to: loss of privacy, loss of the benefit of the bargain, expended time and effort remedying the harm, expended funds remedying the harms, actual damages suffered from identity theft crimes, loss in value of the PII, loss in value of the PHI, an increased risk in victimization for future identity theft crimes as well as a risk in an increase in spam calls, texts, emails, and letters, risk of confusion and personal injury due to personal risks associated with medical fraud.

131.   Plaintiff and subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; declaratory and injunctive relief; reasonable attorneys' fees and costs; and any other relief that is just and proper.

**Count 5**
**Violation of Michigan Nonprofit Health Care Corporation Reform Act**
**MCLS § 550.1406**
**On behalf of Plaintiff and the Michigan Subclass**

132.   Plaintiff incorporates by reference and reallege each and every allegation above as though fully set forth herein.

133.   Plaintiff, Class Members, and Defendant are "persons" as defined by the Michigan Nonprofit Health Care Corporation Reform Act ("Healthcare Act"), MCLS § 550.1107.

134.   Plaintiff and Class Members are "Members" as defined by MCLS § 550.1106.

135.   Defendant McLaren is also a "Health Care Corporation" as defined by the Healthcare Act as meaning "a nonprofit hospital service corporation, medical care corporation, or a consolidated hospital service and medical care corporation incorporated or reincorporated under this act, or incorporated or consolidated under former [acts]" MCLS § 550.1105

136.   The Healthcare Act states, "A healthcare corporation shall, in order to ensure the confidentiality of records containing personal data that may be associated with identifiable members, use reasonable measures to secure those records from unauthorized access and to collect only personal data that [is] necessary" MCLS § 550.1406(1).

137.   By failing to take reasonable precautions to protect the PII and PHI of

Plaintiff and the class members, McLaren has violated this provision of the Healthcare Act.

138. McLaren's acts or practices are unreasonable for multiple reasons including the violation of laws including but not limited to the MCLS § 550.1406(1); the FTC Act, 15 U.S.C. § 45; and the common law, all as alleged herein.

139. McLaren's failure to implement and maintain reasonable data security measures was also contrary to legislatively declared public policy that seeks to protect consumers' personal information and ensure that entities entrusted with PII adopt appropriate security measures. These policies are reflected in various laws, including but not limited to the FTC Act, 15 U.S.C. § 45; and MCLS § 550.1406(1).5 (requiring reasonable data security measures). McLaren's failure to implement and maintain reasonable data security measures also led to substantial patient injuries described herein, which are not outweighed by countervailing benefits to patients.

140. Because McLaren violated the Healthcare Act, Plaintiff is authorized to bring a civil claim pursuant to MCLS § 550.1406(4): "A member may bring a civil claim for damages against a health care corporation for violation of this section and may recover actual damages of $200.00, whichever is greater, together with reasonable attorneys fees and costs."

141. Plaintiff and Subclass Members seek all monetary and non-monetary relief allowed by MCLS § 550.1406(1); including $200 or actual damages,

whichever is greater, together with reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class and Subclass set forth herein, respectfully request the following relief:

A.      That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B.      That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

C.      That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D.      That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F.      That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and

expenses; and

G.      That the Court award pre- and post-judgment interest at the maximum

legal rate and all such other relief as it deems just and proper

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.


Dated: December 8, 2023                    /s/ *Rod M. Johnston*
                                           Rod M. Johnston (P80337)
                                           **JOHNSTON LAW, PLLC**
                                           6911 Duchess Court
                                           Troy, Michigan
                                           Tel: (586) 321-8466
                                           Email: rod@johnstonlawflsa.com

                                           Robert C. Schubart*
                                           Amber L. Schubart*
                                           **SCHUBERT JONCKHEER &**
                                           **KOLBE LLP**
                                           2001 Union St, Ste 200
                                           San Francisco, CA 94123
                                           Tel: (415) 788-4220
                                           Fax: (415) 788-0161
                                           Email: rschubert@sjk.law
                                           Email: aschubert@sjk.law

                                           *Attorneys for Plaintiff and the*
                                           *Proposed Classes*

                                           *\*Application for admission to be filed*